Cornell Wade Shaw v. State















IN THE
TENTH COURT OF APPEALS
 

No. 10-98-239-CR

     CORNELL WADE SHAW,
                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                              Appellee
 

From the 54th District Court
McLennan County, Texas
Trial Court # 97-502-C
                                                                                                                

O P I N I O N
                                                                                                                

      A drug related murder occurred in a Waco neighborhood. The victim died of multiple stab
wounds. We are asked to determine if the jury could properly reject the defendant’s claim of self-defense. When the defendant introduces evidence that he acted in self-defense, the state bears the
burden of showing beyond a reasonable doubt that the force used was not reasonable or justified. 
Because we hold the jury’s rejection of self-defense was not so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust, we will sustain the conviction for
murder. 
 BACKGROUND FACTS
      Cornell Shaw admitted selling the victim, Robert Koenig, Jr., a “rock” of cocaine. Koenig
complained to Shaw about the quality of the crack-cocaine “rock” sold to him by Shaw. Shaw
agreed to return twenty dollars to Koenig: the amount paid for the crack-cocaine. On March 29,
1997, Koenig confronted Shaw in a residential neighborhood and demanded the twenty dollars. 
The confrontation quickly turned into a physical altercation between Shaw and Koenig. Both men
were in their thirties. During the altercation, Koenig was stabbed six times and died as a result
of his wounds. Shaw left the scene of the altercation before police arrived.
      According to the autopsy of Koenig, he died from several knife wounds. The various wounds
perforated a chamber of his heart, grazed his liver and left lung, and also penetrated his hip bone,
ribs, colon, chest, diaphragm, and neck. Koenig died at the scene of the altercation within a few
minutes of when it began.
      Shaw turned himself in to the police. He was charged with the murder of Koenig, under the
Texas Penal Code, Section 19.02. Shaw claimed that he acted in self-defense when he stabbed
Koenig. The jury rejected his self-defense claim and found him guilty of murdering Koenig. 
Punishment was assessed by the jury at 12 years in prison. In his only issue, Shaw contends that
the evidence is not factually sufficient to support the jury's rejection of self-defense.
FACTUAL SUFFICIENCY IN THE SELF-DEFENSE CONTEXT
      Under § 9.32 of the Texas Penal Code, a person is justified in using deadly force against
another if a reasonable person in the actor's situation would not have retreated. Tex. Penal Code
Ann. § 9.32(a) (Vernon 1997). Further, such force is only justified when and to the degree he
reasonably believes the deadly force is immediately necessary to protect himself against the other's
use or attempted use of unlawful deadly force or to prevent the other's imminent commission of
aggravated kidnaping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated
robbery. Id. at (a)(2)(3). The justification of self-defense is a defense to prosecution for murder. 
See Tex. Penal Code Ann. §§ 9.02, 9.32 (Vernon 1997). The State has the burden of persuasion
in disproving evidence of self-defense. Saxon v. State, 804 S.W.2d 910, 913 (Tex. Crim. App.
1991). The State is not required to affirmatively produce evidence which refutes the self-defense
claim; rather, the State has the burden to prove its case beyond a reasonable doubt. Id. 
      Shaw maintains that the proper standard for reviewing the jury's rejection of his defensive
theory is the standard articulated in Clewis v. State, 922 S.W.2d 126, 134-135 (Tex. Crim. App.
1996). We agree. Self-defense is subject to a factual sufficiency challenge and review under the
Clewis standard. See Liggins v. State, 979 S.W.2d 56, 60 (Tex. App.—Waco 1998, pet. ref’d);
Ojeda v. State, 945 S.W.2d 197 (Tex. App.—San Antonio 1997, no pet.); Jones v. State, 951
S.W.2d 522, 527 (Tex. App.—Beaumont 1997, pet. ref’d). In our review for factual sufficiency
of the evidence we consider all the evidence in the record related to the contested issue, "not just
the evidence which supports the verdict.” Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim.
App. 1997). We reverse only if rejection by the jury of Shaw’s evidence of self-defense is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Hernandez v. State, 938 S.W.2d 503, 512 (Tex. App.—Waco 1997, pet. ref’d).
EVIDENCE AT TRIAL
The following evidence was adduced at trial.
 Robyn Koenig
      Robyn Koenig, the sister of Koenig, testified that both she and the victim took Tae Kwon Do
classes more than ten years prior to the altercation. Both Koenig and Robyn attained several black
belts while they were teenagers. Neither had taken karate classes during the intervening sixteen
years. Robyn also testified that she knew very little about karate and that she felt that the
instructor had merely “run them through” the belt system and was just “trying to make us feel
good.”
      On cross-examination, Robyn testified that though Koenig had gone to several competitions,
he had only received one third place trophy when he was sixteen. 
      Officer Claire Crook
      Officer Crook testified that she received a call to a residential neighborhood in Waco at 8:53
p.m. on March 29, 1997, of a stabbing in progress. She and Officer Mason arrived at the location
of the call where there was a large crowd gathered. Officer Crook stated that Koenig was lying
on his back, in the street. He was covered in blood while being held by another man. She
testified that he looked critical and that she called an ambulance and the Special Crimes Unit. She
and Officer Mason sectioned off several blocks, and canvassed the neighborhood. At the time of
canvassing, all persons with whom they spoke denied having seen anything. No weapon was
found.
      On cross, Crook testified to the location of blood splatters at the site and that there were two
or more cars at the location. She also testified that James Gilbert, Mark Anthony Gilbert, and
their mother, Hattie, lived at the house located at the site of the incident.
      Gene Jones
      Jones testified that he was the roommate of Shaw at the time of the incident and that he had
known Shaw for seven or eight years. He testified that on the day of the incident, he and Dwayne
Hardin were outside barbecuing when Shaw arrived. Jones did not see Shaw arrive because he
had smoke in his eyes. He heard the faucet turn on and Shaw began talking to him as he washed
his hands. According to Jones, Shaw stated: “I done fucked up. I hope I killed the white mother-fucker.”
      On cross, Jones testified that he initially thought Shaw was not serious when he made this
statement. In an effort to raise the issue of self-defense, the defense attorney asked about any
potential respiratory difficulty suffered by Shaw. Jones testified that Shaw had been sick at one
point and had used what may have been an inhaler.
      Dwayne Hardin
      On direct, Hardin testified that he saw Shaw prior to the murder and that he was afraid of
Shaw at that time because he was “acting deranged.” On the evening of the murder, he stated that
he saw Shaw walk to the faucet to wash his hands. According to Hardin, Shaw was holding a
folding knife that had a five to six inch blade. Hardin claims that Shaw stated, “I just have
stabbed the white boy and I hope I killed him,” and “He shouldn’t have hit me.” Hardin made
a statement to the police that night about what he had witnessed. Hardin further testified that
though he had charges pending, he had made no deals with the district attorney about his
testimony.
      On cross, Shaw challenged Hardin because the original statement written down by the police
did not include Hardin’s statement that Shaw was acting deranged. Hardin never denied making
the statement but acknowledged that this statement was not included in his original statement as
written down by the officer.
      Randy Aleman
      Officer Randy Aleman testified that he was on duty as the Commander in the Detective Office
on April 1, 1997, when Shaw came in and confessed that he was responsible for killing Koenig
on March 29. 
      Dr. Lynn Salzberger
      Dr. Salzberger, a Forensic Pathologist at the Dallas County Medical Examiner’s Office,
testified that she examined and performed the autopsy upon the body of Koenig. She testified that
in her opinion, Koenig died of multiple sharp force injuries including:
      1)   a stab wound 6 and 1/4 inches deep entering through the chest, traveling through the ribs
and diaphragm, which perforated a chamber of the heart and grazed the liver;
 
      2)   another wound 2 and 3/4 inches deep, located on the backside of Koenig, between the
ribs, which grazed the left lung;
 
      c.   one wound 5 and ½ inches deep which penetrated the hip, the hip bone, the colon, and
the psoas muscle, a deep muscle in the buttock area;
 
      d.   another wound 3/4 inches deep that was small;
 
      e.   a wound to the buttocks, 1 and ½ inches deep; and
 
      f.   an incise wound to the neck which was 4 and ½ inches long and ½ inch deep, which
sliced the neck muscles.

      After detailing the wounds, Salzberger testified that the 6 and 1/4 inch wound, the 2 and 3/4
inch wound, and the 5 and ½ inch wound were the most serious wounds, respectively (numbers
1, 2, and 3). She also testified that while the wound to the neck was capable of causing serious
bleeding over time, it had not hit a major blood vessel. It was her opinion that the other three
wounds were more serious. She concluded testimony detailing the wounds by concluding that
there were no defensive wounds on the body of Koenig but that such wounds are not always
present in a stabbing.
      Salzberger also testified that Koenig had a blood alcohol level of .22, that he was covered with
scrapes and bruises, and that he tested positive for cocaine and cocaine byproducts. According
to her testimony, the autopsy showed that alcohol and cocaine had been ingested recently and in
close proximity with one another.
      During Shaw’s defense, the witnesses he called testified as follows:
      Wanda Wallace
      Wallace, who had known Shaw for two years prior to his arrest, testified that Koenig came
over to her house the night before the altercation. Wallace stated that Koenig threatened to “do
something” to Shaw if he did not pay him back for the poor quality crack. She also testified that
she believed Koenig was serious about his threat.
      On cross, Wallace also testified that Shaw came to her house after the altercation and admitted
to having stabbed Koenig.
      Marcus Anderson
      Anderson testified that he had known Shaw for six years prior to Shaw’s arrest. He stated
that on the day of the murder, but prior to the altercation, Koenig dropped by his house looking
for Shaw, stating, “You tell that black son-of-a-bitch I’m going to kill him.” He also stated that
he saw the fight between the two men, that Koenig had tried to force Shaw into a car, and that
Shaw would not get into the vehicle. He further testified that Koenig rushed Shaw while throwing
karate kicks, then managed to get Shaw into a “headlock.” According to his testimony, Shaw
yelled that he could not breath and asked to be let go. Finally, he stated that Shaw cut Koenig
while in the headlock position, causing Koenig to let go of Shaw. Finally, Anderson stated that
Koenig rushed Shaw again and that Shaw responded by stabbing him again.
      On cross, the prosecution asked Anderson to demonstrate the headlock position he claimed
to have seen Koenig use on Shaw, but Anderson was not able to demonstrate. Anderson admitted
that he told the police he had seen nothing the night of the murder. 
      Jermaine Gilbert
      Jermaine testified that he saw the fight between the two men, that Koenig had a “choke hold”
on Shaw, that he saw Koenig fall to the ground, get up, and attack Shaw again. He also testified
that he heard Koenig threaten Shaw prior to the fight. His testimony puts Anderson’s arrival at
the end of the fight. When asked why he did not go to the police with the information that he
knew, he claimed that he left the scene of the crime because he did not want to be involved in any
way.
      James Gilbert
      James, who admitted that he is a convicted felon and awaiting a murder trial, claimed that he
knew Shaw from the neighborhood and that he knew Koenig because he paid Koenig to work on
his car. He testified that Koenig came by his house looking for Shaw. He also testified that he
saw the fight between the two men, that Koenig attempted to force Shaw into his car, Shaw
resisted, Koenig grabbed him by the neck, and Shaw responded by stabbing him. In his testimony,
he claims that Koenig became more aggressive after he was stabbed. His testimony puts the 6 and
1/4 inch wound to the ribs and heart as the first wound, the 2 and 3/4 inch wound which grazed
the lung as the second wound, and the wound to the neck as the last wound.
      Cornell Wade Shaw
      Shaw testified that he knew Koenig from the crack-cocaine deal. He stated that Koenig
complained of the quality of the drug and that they had agreed that Shaw would return Koenig’s
twenty dollars. He testified that at the time of the fight, Koenig tried to force him into a car. 
Shaw responded by resistance and Koenig kicked him in the stomach. He further testified that
Koenig managed to get him into a neck hold which prevented him from breathing. Shaw claimed
that he took out his knife and stabbed Koenig in order to get free, but that Koenig responded with
more aggression. When asked why he stabbed Koenig, he stated “I wanted out of the situation I
was in.” He claimed that Koenig was stronger. Shaw also testified that he had asthma for a few
years prior but that he had not sought treatment from a doctor.
      On cross, Shaw testified that Koenig had both hands around his neck and that he only stabbed
him in order to get free. When asked how the other stab wounds occurred, he stated that Koenig
might have fallen on the knife accidentally. He admitted that he was six inches taller than Koenig
and that he did not cry for help even though there were twenty or more witnesses watching. He
denied stating that he hoped he had killed Koenig.
      Dr. David Schickner
      During the State’s rebuttal case, Koenig’s medical doctor, Dr. David Schickner, testified that
Koenig’s arm had been crushed in an industrial accident which left his upper body 73% impaired
with an impairment of 44% overall. He further testified that movement in Koenig’s left arm was
limited, that any movement in his elbow caused intense pain, and that he could easily overcome
Koenig’s arm during strength testing. 
      During cross, the doctor testified that the upper deltoid muscle had a normal range of motion
and that Koenig had recently gained minor flexibility in three of his fingers.
APPLICATION OF LAW TO FACTS
      Through witness testimony, Shaw presented evidence that Koenig had him in a headlock or
choke hold position. He asserts that his use of deadly force was justified because Shaw was
choking him. The testimony offered by Shaw and his witnesses create a fact issue on self-defense
and the use of deadly force. Shaw maintains that Koenig held him around the neck, preventing
him from breathing. The prosecution maintains that Koenig was unarmed and did not have fullgh
use of his upper body and left arm. 
      We must give due deference to the jury's assessment of the credibility of the witnesses and
the weight to be given their testimony. Clewis, 922 S.W.2d at 135; Hernandez, 938 S.W.2d at
512. The jury is the trier of fact, and is the ultimate authority on the credibility of witnesses and
the weight to be given to their testimony. Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim.
App. [panel op.] 1981). The jury was required to find beyond a reasonable doubt that deadly
force was not justified in this case. It is possible that the jury could believe the testimony
produced by the State and the testimony produced by Shaw and still reject the self-defense claim. 
If the jury believed both that Shaw’s breathing was being restricted and that Koenig was physically
lame from an accident, they could still conclude that it was not reasonable to use deadly force in
response to the situation.
      Shaw urges us to find that the evidence overwhelmingly favors his claim of self-defense in that
all of his eye witnesses claim that Koenig attacked him first, attempted to choke him, and
continued to attack him after having been stabbed. The State attempts to contradict this testimony
by introducing evidence of statements made by Shaw after he stabbed Koenig, while also showing
that each witness called by Shaw knew him for some time before the altercation took place and did
not come forward with any information on the night of the altercation. While such evidence may
or may not be in conflict, it is for the jury as trier of fact to resolve any conflicts and
inconsistencies in the evidence. Bowden v. State, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982). 
Even where there is no conflict, the jury may give no weight to some evidence, and thereby reject
part or all of a witness's testimony. See Beardsley v. State, 738 S.W.2d 681, 684 (Tex. Crim.
App. 1987); see also Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (holding
jury as judge of credibility may "believe all, some, or none of the testimony").
CONCLUSION
      Considering all the evidence, both for and against the verdict, we conclude that the evidence
is factually sufficient to support the jury’s rejection of Shaw’s self-defense theory. From our
review of the evidence, we cannot say that the verdict "is so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust." Clewis, 922 S.W.2d at 134; Hernandez, 938
S.W.2d at 512. Thus, we conclude that the evidence is factually sufficient to support the verdict
that Shaw is guilty beyond a reasonable doubt of murdering Robert Koenig, Jr. Accordingly, we
overrule Shaw’s only issue.

                                                                                     TOM GRAY
                                                                                     Justice
Before Chief Justice Davis,
      Justice Vance, and 
      Justice Gray
Affirmed
Opinion delivered and filed June 23, 1999
Publish